## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE SOUTHERN DISTRICT OF FLORIDA

PATRICK AMORIELLO,                    CASE NO.:

       Plaintiff,

VS.

OCWEN LOAN SERVICING, LLC

       Defendant.

_____

## PLAINTIFF PATRICK AMORIELLO'S COMPLAINT FOR DAMAGES
## AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiff, PATRICK AMORIELLO, by and through undersigned counsel, and hereby brings this action against Defendant, OCWEN LOAN SERVICING, LLC, and in support thereof states the following:

### NATURE OF ACTION

1. This is an action brought pursuant to 12 C.F.R. §1024 *et seq.* [Real Estate Settlement Procedures Act ("Regulation X")].

### PARTIES JURISDICTION AND VENUE

1. Plaintiff, PATRICK AMORIELLO (hereinafter referred to as "AMORIELLO"), is a natural person who at all relevant times resided in Broward County, Florida and has maintained property located at 11823 Highland Place, Coral Springs, FL 33071  (herein after the "Property")

as Plaintiff's primary residence.

2. Defendant, OCWEN HOME MORTGAGE, (hereinafter referred to as "OCWEN") has at all relevant times transacted business in the State of Florida and is a servicer of a note (the "Note") and a mortgage on the Property that allegedly secures the Note (the "Mortgage) (collectively referred to hereinafter as the "Loan").

3. Jurisdiction and Venue are proper pursuant to 28 U.S.C. § 1331 as this action arises from the Dodd Frank Wall Street Reform and Consumer Protection Act ("DFA") and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, et seq. ("RESPA").

4. This action is specifically filed to enforce regulations promulgated by the Consumer Finance Protection Bureau ("CFPB") that became effective of January 10, 2014 specifically, 12 C.F.R. § 1024.36 of Regulation X and 12 C.F.R. §1024.41 of Regulation X.

5. This Court has supplemental jurisdiction to hear any and all state law claims pursuant to 28 U.S.C. § 1367.

6. OCWEN is a "servicer" as defined by 12 C.F.R. 1024.2.

## INTRODUCTION

7. Plaintiff restates and incorporates herein all of his statements and allegations contained in the preceding paragraphs in their entirety, as if

fully rewritten.

8.  In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

9.  Specifically, on January 17, 2013, the CFPB issued the RESPA (Regulation X) and TILA (Regulation Z) Mortgage Servicing Final Rules, 78 F. R. 10901 (February 14, 2013) and 78 F.R. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

10. The loan in the instant matter is a "federally related mortgage loan" as said term is defined by 12 C.F.R. § 1024.2(b).

11. Defendant is the subject to the aforesaid Regulations and does not qualify for the exception for "small servicers" as such term is defined in 12 C.F.R. § 1026.41(e)(4), nor for the exemption for a "qualified lender" as such term is defined in 12 C.F.R. §617.100.

12. Plaintiff is asserting a claim for relief against Defendant for breach of the specific rules under Regulation X and Regulation Z as set forth below.

13. Plaintiff has a private right of action under RESPA pursuant to 12 U.S.C. §2605(f) for the claimed breaches and such action provides for remedies including actual damages, costs, statutory damages, and attorneys' fees.

## FACTUAL ALLEGATIONS

14. On February 10, 2017, AMORIELLO executed a Mortgage and Note in favor of Homeward Residential, Inc. (Mortgage attached hereto as Exhibit "A").

15. In an effort to evaluate his loan and explore all options moving forward, AMORIELLO wished to gather information pertaining to his loan so as to analyze the payment history against a payoff and otherwise make sure that her loan was serviced correctly.

16. On May 1, 2017, AMORIELLO, through the undersigned counsel, submitted a written Request for Information to OCWEN, via certified mail requesting the following information: (i) the name of the owner or assignee of my client's mortgage loan; (ii) the address and telephone number for the owner or assignee of my client's mortgage loan; (iii) the name, position, and address of an officer of the entity that is the owner of the above-referenced loan;  (iv) a complete payment history of my client's loan; (v) an accounting of all interest and escrow payments made by my client and how they were applied to the outstanding balance; and (vi) the date the current owner acquired the loan; and (vii) any other relevant information for the owner or assignee of the above-referenced loan. (A copy of Request for Information is attached hereto as Exhibit

"B").

17. The May 1, 2017 Request for Information was received by OCWEN on May 4, 2017.

18. As the May 1, 2017 Request for Information was received by OCWEN on May 4, 2017, OCWEN was required to provide an acknowledgment of receipt of the Request for Information on or before May 11, 2017.

19. As the May 1, 2017 Request for Information was received by OCWEN on May 4, 2017, and because the substance of the request was regarding ownership of the loan, OCWEN was required to provide a response regarding the identity of the owner of the loan on or before May 18, 2017.

20. As the May 1, 2017 Request for Information was received by OCWEN on May 4, 2017, OCWEN was required to provide a full response to the remaining requests in the Request for Information on or before June 16, 2017.

21. OCWEN sent a letter to the undersigned in response to the May 1, 2017 Request for Information which was dated May 15, 2017—five days past the statutorily required deadline—which did not acknowledge receipt of the Request for Information and only stated that attorney representation was added to the account.

22. However, OCWEN failed to provide any response to the May 1, 2017 Request for information on or before June 16, 2017.

23. In a Notice of Error (sent through the undersigned counsel) dated June 29, 2017 sent via certified mail, AMORIELLO informed OCWEN of its error of failing to respond to the May 1, 2017 Request for Information. (A copy of the June 29, 2017 Notice of Error is attached hereto as "Exhibit C").

24. The June 29, 2017 Notice of Error was received by OCWEN on July 17, 2017.

25. OCWEN failed to provide an acknowledgement of the June 26, 2017 Request for Information.

26. As the June 29, 2017 Notice of Error was received by OCWEN on July 1, 2017, OCWEN was required to provide a response regarding the identity of the owner of the loan on or before July 31, 2017.

27. As the June 29, 2017 Notice of Error was received by OCWEN on July 17, 2017, OCWEN was required to provide a full response on or before August 28, 2017.

28. In a letter dated July 20, 2017, OCWEN issued an acknowledgement of receipt of the June 26, 2017 Notice of Error, however the letter contained no additional information. (A copy of the July 20, 2017

6

acknowledgement is attached hereto as Exhibit "D").

29. Next, in a letter dated July 26, 2017, OCWEN issued a partial response to AMORIELLO's Notice of Error in that the response provided: (i) that the account was updated to reflect attorney representation; (ii) the date of loan origination and the originating lender; (iii) that a request has been made to provide a payment history of the loan; and (iv) that OCWEN was the servicer of the loan on behalf of the Federal National Mortgage Association (and that ownership may change). (A copy of the July 26, 2017 response is attached hereto as Exhibit "E")

30. Absent from OCWEN's response to the July 26, 2017 Notice of Error was: (i) the identity of the current owner of the loan, and its address and contact phone number; (ii) the name, of a corporate officer of the owner of the loan, and the contact address and telephone number; (iii) a complete payment history of the loan; (iv) a full accounting of all interest and escrow payments made and how they were applied to the outstanding balance; and  (v) the date the current owner acquired the loan.

31. AMORIELLO was unable to make an informed decision about his loan, including the possibility of refinancing or listing his home for sale due to OCWEN's failure to respond to her Request for Information and Notice of Error.

32. AMORIELLO wished to examine his payoff and her payment history and escrow statements to ensure that the figures were correct prior to applying to refinance or listing his home for sale and also as a tool for determining a listing price.

33. AMORIELLO also requested the identity of her loan as to ensure that any payoff of the loan was paid to the correct party.

34. However, due to OCWEN's pattern and practice of failing to adequately and timely respond to AMORIELLO's requests, AMORIELLO has suffered damages in delays of listing her home for sale.

35. AMORIELLO has incurred actual damages in the form of the costs associated with sending a Request for Information and a Notice of Error. AMORIELLO has incurred actual damages in the form of obtaining legal advice and in obtaining assistance with the preparation and certified mailings of the Notice of Error.

36. AMORIELLO has been forced to retain legal counsel in an effort to hold Defendant liable for the multiple violations of law described herein.

37. AMORIELLO has also experienced significant emotional distress as a result of the ongoing frustration caused by OCWEN's continued failures to properly respond to Plaintiff's Request for Information and Notice of Error as is required.

## <u>COUNT I</u>
## <u>VIOLATION OF 12 C.F.R. § 1024.36(c)</u>

38. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 37.

39. Pursuant to 12 C.F.R. <u>§ 1024.36(c)</u>, "[w]ithin five days (excluding legal public holidays, Saturdays, and Sundays) of a servicer receiving an information request from a borrower, the servicer shall provide to the borrower a written response acknowledging receipt of the information request."

40. Plaintiff sent a Request for Information to OCWEN dated May 1, 2017, which was received on May 4, 2017.

41. Pursuant to 12 C.F.R. <u>§ 1024.36(d)(2)(i)(A)</u>, OCWEN was required to acknowledge receipt of the Request for Information within five business days of receipt.

42. However, OCWEN never acknowledged receipt of the Request for Information received on May 4, 2017.

43. Therefore, OCWEN violated 12 C.F.R. <u>§ 1024.36(c)</u> by failing to provide an acknowledgement of receipt of the May 1, 2017 Request for Information within five business days of receipt.

44. OCWEN's actions are believed to be a pattern and practice of behavior in conscious disregard for the Plaintiff's rights.

45. As a result of OCWEN's actions, OCWEN is liable to the Plaintiff for actual damages, statutory damages, costs and attorney's Fees.

WHEREFORE, the Plaintiff prays for relief and judgment, as follows:

   a) Adjudging that OCWEN violated 12 C.F.R. § 1024.36(c);

   b) Awarding Plaintiff statutory damages, pursuant to 12 U.S.C. §2605(f). in the amount of $2,000.00;

   c) Awarding Plaintiff actual damages pursuant to 12 U.S.C.§ 2065(f)(1)(B)

   d) Adjudging that the failures of the OCWEN are part of a practice and pattern

   e) Awarding Plaintiff reasonable attorneys' fees and costs incurred in this action pursuant to 12 U.S.C. §2065(f);

   f) Awarding Plaintiff pre-judgment and post judgment interest as permissible by law; and

   g) Awarding Plaintiff such other relief as this Court may deem just and proper.

**COUNT II**
**VIOLATION OF 12 C.F.R. § 1024.36(d)(2)(i)(A)**

10

46. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 37.

47. Pursuant to 12 C.F.R. § 1024.36(d)(2)(i)(A):

A Servicer must comply with the requirement of paragraph (d)(1) of this section:… "[n]ot later than 10 days excluding legal public holidays, Saturdays, and Sundays) after the servicer receives an information request for the identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan.

48. Plaintiff sent a Request for Information to OCWEN dated May 1, 2017, which was received on May 4, 2017.

49. Pursuant to 12 C.F.R. § 1024.36(d)(2)(i)(A), OCWEN was required to respond to the information requested the identity of the owner of the loan within 10 business days of receipt. However, OCWEN never responded with any type of information regarding the owner of the loan.

50. Therefore, OCWEN violated 12 C.F.R. § 1024.36(d)(2)(i)(A) by failing to provide the name of the owner of the note within 10 business days of receipt.

51. OCWEN's actions are believed to be a pattern and practice of behavior in conscious disregard for the Plaintiff's rights.

52. As a result of OCWEN's actions, OCWEN is liable to the Plaintiff for actual damages, statutory damages, costs and attorney's Fees.

WHEREFORE, the Plaintiff prays for relief and judgment, as follows:

h) Adjudging that OCWEN violated 12 C.F.R. § 1024.36(2)(i)(A);

i) Awarding Plaintiff statutory damages, pursuant to 12 U.S.C. §2605(f). in the amount of $2,000.00;

j) Awarding Plaintiff actual damages pursuant to 12 U.S.C.§ 2065(f)(1)(B)

k) Adjudging that the failures of the OCWEN are part of a practice and pattern

l) Awarding Plaintiff reasonable attorneys' fees and costs incurred in this action pursuant to 12 U.S.C. §2065(f);

m) Awarding Plaintiff pre-judgment and post judgment interest as permissible by law; and

n) Awarding Plaintiff such other relief as this Court may deem just and proper.

## **COUNT III**
## **VIOLATION OF 12 C.F.R. § 1024.36(d)(2)(B)**

53. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 37.

54. Pursuant to 12 C.F.R. § 1024.36(d)(2)(B): "[a] servicer must comply with the requirements of paragraph (d)(1) of this section … For all other requests for information, not later than 30 days (excluding legal public

holidays, Saturdays, and Sundays) after the servicer receives the information request."

55. The Plaintiff sent a Request for Information to OCWEN dated May 1, 2017, which was received by OCWEN on May 4, 2017.

56. Pursuant to 12 C.F.R. § 1024.36(d)(2)(B), OCWEN was required to provide a full response to AMORIELLO'S Request for Information on or before thirty (30) business days after receipt.

57. However, OCWEN did not respond to AMORIELLO'S May 1, 2017 Request for Information.

58. Therefore, OCWEN violated 12 C.F.R. § 1024.36(d)(2)(B) by failing to provide a full response to AMORIELLO'S April 11, 2017 Request for Information within thirty (30) business days of receipt.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

o) Adjudging that Defendant violated 12 C.F.R. § 1024.36(d)(2)(B);

p) Awarding Plaintiff statutory damages, pursuant to 12 U.S.C. §2605(f). in the amount of $2,000.00;

q) Awarding Plaintiff actual damages pursuant to 12 U.S.C.§ 2065(f);

r) Awarding Plaintiff reasonable attorneys' fees and costs incurred in this action pursuant to 12 U.S.C. §2065(f);

s) Awarding Plaintiff pre-judgment and post judgment interest as

permissible by law; and

t)  Awarding Plaintiff such other relief as this Court may deem just and proper.

## COUNT IV
## VIOLATION OF 12 C.F.R. § 1024.36(d)(2)(A)

59. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 37.

60. Pursuant to 12 C.F.R. § 1024.36(d)(2)(A): "[n]ot later than 10 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives an information request for the identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan."

61. The Plaintiff sent a Notice of Error to OCWEN dated June 29, 2017, which was received by OCWEN on July 17, 2017.

62. The Plaintiff's June 29, 2017 Notice of Error sought information regarding the identity of the owner of the mortgage loan.

63. Pursuant to 12 C.F.R. § 1024.36(d)(2)(A), OCWEN was required to provide a full response to the Plaintiff's Notice of Error on or before ten (10) business days after receipt.

64. Although OCWEN provided a partial response to the June 29, 2017

Notice of Error in that OCWEN was the servicer on behalf of Federal National Mortgage Association, the July 24, 2017 "response" did not provide the identity of the current owner of the loan—which was requested back in the May 1, 2017 Request for Information as well as the June 29, 2017 Notice of Error.

65. Therefore, OCWEN violated 12 C.F.R. § 1024.36(d)(2)(A) by failing to provide a full response as to the identity of the current owner of the loan within ten (10) business days of receipt of the Notice of Error.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a) Adjudging that Defendant violated 12 C.F.R. § 1024.36(d)(2)(A);

b) Awarding Plaintiff statutory damages, pursuant to 12 U.S.C. §2605(f). in the amount of $2,000.00;

c) Awarding Plaintiff actual damages pursuant to 12 U. S.C.§ 2065(f);

d) Awarding Plaintiff reasonable attorneys' fees and costs incurred in this action pursuant to 12 U.S.C. §2065(f);

e) Awarding Plaintiff pre-judgment and post judgment interest as permissible by law; and

f) Awarding Plaintiff such other relief as this Court may deem just and proper.

## COUNTS V, VI, VII, and VIII
## VIOLATION OF 12 C.F.R. § 1024.35(e)(2)(i)(C)

66. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 37.

67. Pursuant to 12 C.F.R. § 1024.35(e)(2)(i)(C): "[f]or all other asserted errors, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the applicable notice of error."

68. Comment 1 of the Official CFPB Interpretations to 12 C.F.R § 1024.35(e)(4) indicates that a notice of error alleging multiple errors may be treated as separate notices of error.

69. The Plaintiff sent a Notice of Error to OCWEN dated June 29, 2017, which was received by OCWEN on July 17, 2017.

70. Plaintiff's Notice of Error informed OCWEN that it failed to respond to the following information requests: (i) the identity of the current owner of the loan, and its address and contact phone number; (ii) the name, of a corporate officer of the owner of the loan, and the contact address and telephone number; (iii) a complete payment history of the loan; (iv) a full accounting of all interest and escrow payments made and how they were applied to the outstanding balance; and  (v) the date the current owner acquired the loan.

16

71. Pursuant to Comment 1, OCWEN's failure to remedy the error of responding to the above requests are to be treated as separate notices of error.

72. Therefore, OCWEN violated 12 C.F.R. § 1024.35(e)(2)(i)(C) by failing to provide a full response to AMORIELLO'S June 29, 2017 Notice of Error within thirty (30) business days of receipt.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a) Adjudging that Defendant violated 12 C.F.R. § 1024.35(e)(2)(i)(C);

b) Awarding Plaintiff statutory damages, pursuant to 12 U.S.C. §2605(f). in the amount of $2,000.00;

c) Awarding Plaintiff actual damages pursuant to 12 U.S.C.§ 2065(f);

d) Awarding Plaintiff reasonable attorneys' fees and costs incurred in this action pursuant to 12 U.S.C. §2065(f);

e) Awarding Plaintiff pre-judgment and post judgment interest as permissible by law; and

f) Awarding Plaintiff such other relief as this Court may deem just and proper.

## COUNT IX
## VIOLATION OF 12 CFR §1024.35(e)(1)(i)

73. Plaintiff repeats and re-alleges each and every allegation contained in

17

paragraphs 1 through 37.

74. Pursuant to 12 C.F.R. §1024.35(e)(1)(i),

A servicer must respond to a notice of error by either: (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or (B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

75. Comment 1 of the Official CFPB Interpretations to 12 C.F.R § 1024.35(e)(4) indicates that a notice of error alleging multiple errors may be treated as separate notices of error.

76. First, OCWEN failed to correct any of the items raised in the Plaintiff's June 29, 2017 Notice of Error as none of the requested information or documents were provided in the response.

77. To-date OCWEN has failed to provide: (i) the name, address, and telephone number of the owner of the loan; (ii) the name of a corporate officer of the owner of the loan, address, and telephone number; (iii) a complete payment history of the loan; (iv) a full accounting of all interest and escrow payments made and how they were applied to the outstanding

balance; and (v) the date the current owner acquired the loan.

78. Additionally, OCWEN did not include any of the required language regarding an investigation onto the identified servicing errors in its response to the Plaintiff's Notice of Error.

79. Therefore, OCWEN violated 12 C.F.R. §1024.35(e)(1)(i) be failing to correct any of the identified servicing errors and for failing to include the required investigation language in its response to the Plaintiff's Notice of Error.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

    a) Adjudging that Defendant violated 12 C.F.R. §1024.35(e)(1)(i);

    b) Awarding Plaintiff statutory damages, pursuant to 12 U.S.C. §2605(f). in the amount of $2,000.00 for each count;

    c) Awarding Plaintiff actual damages pursuant to 12 U.S.C.§ 2065(f);

    d) Awarding Plaintiff reasonable attorneys' fees and costs incurred in this action pursuant to 12 U.S.C. §2065(f);

    e) Awarding Plaintiff pre-judgment and post judgment interest as permissible by law;

    f) Awarding Plaintiff injunctive relief to stop the pending foreclosure sale of Plaintiff's homestead property; and

    g) Awarding Plaintiff such other relief as this Court may deem just

and proper.

## **TRIAL BY JURY**

80. Plaintiff is entitled to and hereby demands a trial by jury.

Dated: <u>February 27, 2018</u>

Respectfully Submitted,
**JULIANA GAITA, P.A.**
*Attorneys for Plaintiff*
BY:<u>   /s/ *Lisa Hailey, Esq.*   </u>
Lisa Hailey, Esq. / FBN 123827
2701 Boca Raton Boulevard, Suite 107
Boca Raton, FL 33431
Tel. #:561.869.3703
Fax #:866.292.0295
E-mail: eservice@gllawcenter.com

INSTR # 114247105  Page  1 of 18, Recorded 03/07/2017 at 04:31 PM
Broward County Commission, Doc. M $756.00 Int Tax $432.00 Deputy Clerk ERECORD
Case 18-CV-60418-JJ Document 1 Entered on FLSD Docket 02/24/2018 Page 21 of 49

# Exhibit "A"

This Instrument Prepared By:

INDECOMM GLOBAL SERVICES MAIL STOP-FD-HR-9000
Lisa Bowling
1260 ENERGY LANE
ST. PAUL, MINNESOTA 55108
Loan Number: 7161283630

After Recording Return To:
American Title Services, Inc.
2801 N University Drive # 204
Coral Springs, FL 33065

——— [Space Above This Line For Recording Data] ———

# MORTGAGE

**MIN:** 100668971612836307          **MERS Phone: 888-679-6377**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** **"Security Instrument"** means this document, which is dated    FEBRUARY 10, 2017   , together with all Riders to this document.
**(B)** **"Borrower"** is Patrick L Amoriello and Paula S Amoriello husband and wife
.

Borrower is the mortgagor under this Security Instrument.
**(C)** **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D)** **"Lender"** is HOMEWARD RESIDENTIAL INC
.

Lender is a DELAWARE CORPORATION                    organized
and existing under the laws of          DELAWARE
Lender's address is 16675 ADDISON ROAD, ADDISON, TEXAS 75001

**(E)** **"Note"** means the promissory note signed by Borrower and dated    FEBRUARY 10, 2017  .
The Note states that Borrower owes Lender   TWO HUNDRED SIXTEEN THOUSAND AND 00/100          Dollars (U.S. $ 216,000.00     ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MARCH 1, 2027     .

---

 DocMagic *eForms*
www.docmagic.com



**(F)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | | |
|---|---|---|---|
| ☐ | Adjustable Rate Rider | ☒ | Planned Unit Development Rider |
| ☐ | Balloon Rider | ☐ | Biweekly Payment Rider |
| ☐ | 1-4 Family Rider | ☐ | Second Home Rider |
| ☐ | Condominium Rider | ☐ | Other(s) [specify] |

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(J)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(K)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L)** **"Escrow Items"** means those items that are described in Section 3.
**(M)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(N)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(O)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

|                        | COUNTY  of  Broward | : |
|------------------------|---------------------|---|
| [Type of Recording Jurisdiction] | [Name of Recording Jurisdiction] |   |

A.P.N.:  48-41-30-01-0811

**The Northeasterly 55.00 feet of Lot 4, Block E, Eagle Trace, according to the map or plat thereof as recorded in Plat Book 116, Page 19, of the Public Records of Broward County, Florida.**

which currently has the address of            11823  Highland  Pl
                                                          [Street]

     Coral  Springs          , Florida     33071     ("Property Address"):
            [City]                                 [Zip Code]

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
     BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
     THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and

assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder

of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3010 1/01                                    Page 6 of 15                          DocMagic *eForms*
                                                                                       www.docmagic.com

If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.  Occupancy.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.  Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.  Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument; including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share

of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3010 1/01                                    Page 9 of 15                      *DocMagic eForms*
                                                                                   *www.docmagic.com*

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3010 1/01                               Page 10 of 15                         *DocMagic* eFⒸrms
                                                                                  www.docmagic.com

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the

purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20.  Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21.  Hazardous Substances.**  As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property.  Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized

to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.**  Borrower and Lender further covenant and agree as follows:

**22.  Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property.  The notice shall further inform Borrower of the right  to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23.  Release.**  Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument.  Borrower shall pay any recordation costs.  Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24.  Attorneys' Fees.**  As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25.  Jury Trial Waiver.**  The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
                                     -Borrower
Patrick L Amoriello
11823 Highland Pl, Coral
springs, FL 33071

_____ (Seal)
                                     -Borrower
Paula S Amoriello
11823 Highland Pl, Coral
springs, FL 33071

_____ (Seal)
                                     -Borrower

_____ (Seal)
                                     -Borrower

_____ (Seal)
                                     -Borrower

_____ (Seal)
                                     -Borrower

———————————— [Space Below This Line For Acknowledgment] ————————————

STATE OF __FLORIDA_____

COUNTY OF _Broward_____

    The foregoing instrument was acknowledged before me this ____2/10/17_____

                                                                    (date)

by _Patrick L Amoriello AND Paula S Amoriello_____

_____

_____ ,

                                  (name of person acknowledging)

who is personally known to me or who has produced _DRIVER LICENSES_____

                                           (type of identification)

as identification.

             FRANCISCO SALOMON CUEVAS JR

             MY COMMISSION # FF942751

             EXPIRES December 10, 2019

        (407) 398-0153  FloridaNotaryService.com

_____

(Signature)

FRANCISCO S. CUEVAS JR

(Notary's Name printed, typed or stamped)

NOTARY PUBLIC

Title or Rank

NA

Serial Number, if any

         (Seal)

Loan Originator: Rafael Delgado, NMLSR ID 1407102
Loan Originator Organization: Residential Savings Mortgage Inc., NMLSR ID 155558
Loan Originator Organization: Homeward Residential Inc, NMLSR ID 3984

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3010 1/01                 Page 15 of 15                  DocMagic eForms
                                                          www.docmagic.com

Loan Number: 7161283630

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this        10th        day of
FEBRUARY, 2017                         , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date,
given by the undersigned (the "Borrower") to secure Borrower's Note to  HOMEWARD
RESIDENTIAL INC, A DELAWARE CORPORATION
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

        11823 Highland Pl, Coral Springs, Florida 33071
                          [Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other
such parcels and certain common areas and facilities, as described in
COVENANTS, CONDITIONS AND RESTRICTIONS OF RECORD

(the "Declaration").  The Property is a part of a planned unit development known as

                    Eagle Trace
              [Name of Planned Unit Development]

(the "PUD").  The Property also includes Borrower's interest in the homeowners association or equivalent
entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the
uses, benefits and proceeds of Borrower's interest.

   **PUD COVENANTS.**  In addition to the covenants and agreements made in the Security Instrument,
Borrower and Lender further covenant and agree as follows:

   **A.  PUD Obligations.**  Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents.  The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation,
trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or
other rules or regulations of the Owners Association.  Borrower shall promptly pay, when due, all dues and
assessments imposed pursuant to the Constituent Documents.

   **B.  Property Insurance.**  So long as the Owners Association maintains, with a generally accepted
insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and

---

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01                                     Page 1 of 3





which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
Patrick L Amoriello        -Borrower

_____ (Seal)
Paula S Amoriello          -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

Exhibit "B"

# GAITA & LISZT, P.L.

### ATTORNEYS AT LAW

JULIANA GAITA, ESQ.  *Admitted in FL &MA*
JOSHUA M. LISZT, ESQ.  *Admitted in FL & GA*
LISA HAILEY, ESQ. *Admitted in FL*

May 1, 2017

**VIA CERTIFIED MAIL #7016 0910 0001 7946 1136**

Ocwen Loan Servicing, LLC
Research
P.O. Box 24736
West Palm Beach, FL 33416-4736

**RE: Request for Information Pursuant to 12 CFR § 1024.36(g)**

Borrower:              Patrick L Amoriello
Property Address:      11823 Highland Place, Coral Springs, FL 33071
Loan Number:           ███████████

To Whom It May Concern:

The undersigned represents the alleged borrower for the above-referenced loan. As the alleged servicer of the above-referenced borrower's mortgage loan, please treat this as a Request for Information (RFI) pursuant to the Real Estate Settlement Procedures Act, 12 U.S.C. 2605(f). Be advised that your response herein is subject to the time period set out in Regulation X, 12 CFR §1024.35(e)(3)(i)(B).

At this time, please provide the following information: (i) the name of the owner or assignee of my client's mortgage loan; (ii) the address and telephone number for the owner or assignee of my client's mortgage loan; (iii) the name, position, and address of an officer of the entity that is the owner of the above-referenced loan;  (iv) a complete payment history of my client's loan; (v) an accounting of all interest and escrow payments made by my client and how

# GAITA & LISZT, P.L.

### ATTORNEYS AT LAW

JULIANA GAITA, ESQ. *Admitted in FL &MA*
JOSHUA M. LISZT, ESQ. *Admitted in FL & GA*
LISA HAILEY, ESQ. *Admitted in FL*

they were applied to the outstanding balance; (vi) the date the current owner acquired the loan;

and (v) any other relevant information for the owner or assignee of the above-referenced loan.

Thank you for taking the time to respond to this request.

Best regards,

Lisa Hailey, Esq.

Encl. Third Party Authorization

DocuSign Envelope ID: 289BA805-66B8-4C66-8A93-D9A61CE687A4

ATTORNEYS AT LAW

## Borrower's Authorization to Release Information to Third Party

**Mortgage Servicer Name:**    OCWEN LOAN SERVICING,LLC

Alleged Borrower:     Patrick L Amoriello

Property Address:     11823 Highland Place Coral Springs FL 33071

Loan Number:

I, _____AMORIELLO,PATRICK L_____, THE UNDERSIGNED, HEREBY AUTHORIZE THE SERVICER LISTED ABOVE AND ITS AGENTS, REPRESENTATIVES, SUCCESSORS, COLLECTION COMPANIES AND LEGAL REPRESENTATIVES TO DISCUSS AND RELEASE MY ACCOUNT INFORMATION TO/WITH THE FOLLOWING INDIVIDUALS AT THE LAW FIRM OF *GAITA & LISZT, P.L.*, IN AN EFFORT TO SETTLE OR OTHERWISE RESOLVE THE ABOVE REFERENCED MATTER:

1. JOSHUA M. LISZT, ESQ.
2. JULIANA GAITA, ESQ.
3. LISA HAILEY, ESQ.

Client:    AMORIELLO,PATRICK L      DATE      4/26/2017

2701 BOCA RATON BOULEVARD, SUITE 107, BOCA RATON, FLORIDA 33431

T: 561.869.3703 F: 866.292.0295

Exhibit "C"

# GAITA & LISZT, P.L.

### ATTORNEYS AT LAW

JULIANA GAITA, ESQ. *Admitted in FL & MA*
LISA HAILEY, ESQ. *Admitted in FL*

June 29, 2017

**VIA CERTIFIED MAIL#** 7017 0660 0000 5334 2800

**Ocwen Loan Servicing, LLC, research**
**P.O. Box 24736**
**West Palm Beach, FL 33416-4736**

      **RE: NOTICE OF ERROR PURSUANT TO 12 CFR §1024.35**
      Borrower: **Patrick L. Amoriello**
      Property Address: **11823 Highland Place, Coral Springs, FL 33071**
      Loan Number█████████

To Whom It May Concern:

    As the alleged servicer of the above-referenced borrower's mortgage loan, please treat this as a Notice of Error (NOE) pursuant to the Real Estate Settlement Procedures Act, 12 U.S.C. 2605(e). Be advised that your response herein is subject to the time period set out in Regulation X, 12 CFR §1024.35(e)(3)(i)(B).

    The undersigned sent a request for information, dated May 1, 2017 and received in your office on May 4, 2017 on behalf of the above-referenced borrower. However, as of the date of this letter you have failed to send a timely acknowledgment of receiving that request and a response to the request for information. You have therefore committed a servicing error as prescribed by 12 CFR §1024.35(b)(11) by failing to send correspondence regarding the request for information to the undersigned. Please make sure that your response is not only dated, but postmarked.

    Please respond to the request for information.

                        Regards,

                        Lisa Hailey, Esq.
                        For the Firm

EXHIBIT "D"



O C W E N

P.O. Box 24646
West Palm Beach, FL 33416-4646

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE PAID
VE LTD

**FIRST CLASS MAIL**



18   FJDIIP1   33431



## Ocwen Loan Servicing, LLC
www.ocwen.com
*Helping Homeowners Is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

O C W E N

---

07/20/2017                                                                 Loan Number ███████



Patrick L Amoriello
Paula S Amoriello
2701 NW 2ND AVE STE 107
C/O GAITA AND LISZT P.L
BOCA RATON, FL 33431-6707

Property Address: 11823 Highland Pl
Coral Springs, FL 33071

Dear Customer(s),

We have received your correspondence on the above referenced loan. It is Ocwen's goal  to complete all research and provide a written response to you within (10) business days from the date of the receipt of your letter. While most requests are addressed within 10 business days, some requests may require additional time. In the event we are unable to issue a complete response within 30 days, you will receive a letter indicating additional time is required.

We may need to contact you for further information in order to process your request. Please direct any additional information regarding your correspondence to the following address:

**Ocwen Loan Servicing, LLC**
**Attention: Research Department**
**P.O. Box 24736**
**West Palm Beach, FL 33416-4736**

You may also contact our Customer Care Center at 800.746.2936. We are available Monday through Friday 8 am to 9 pm, Saturday 8 am to 5 pm and Sunday 9 am to 9 pm ET.

Sincerely,
Loan Servicing

---

NMLS # 1852                                                                 ACKNOWLM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

2-814-AEQ00-0000707-001-01-000-000-000-000



PATRICK L AMORIELLO
PAULA S AMORIELLO
C/O GAITA AND LISZT P.L
2701 NW 2ND AVE STE 107
BOCA RATON FL 33431-6707



# EXHIBIT "E"



O C W E N

P.O. Box 24646
West Palm Beach, FL 33416-4646

PR
FIRST
U.S. P

**FIRST CLA**

i0    FKT-AP1    33431



**Ocwen Loan Servicing, LLC**
www.ocwen.com
*Helping Homeowners Is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

07/24/2017

Loan Number: ▇▇▇▇



Gaita & Liszt P.L.
2701 Boca Raton Boulevard, Suite 107
Boca Raton, FL 33431

Property Address: 11823 Highland Pl
Coral Springs, FL 33071

Dear   Gaita & Liszt P.L.,

Ocwen Loan Servicing, LLC (OCWEN) would like to take this opportunity to thank you for your recent communication regarding the above referenced loan. We appreciate the time and effort on your part to bring your concern to our attention. Pursuant to your request, we have reviewed the loan and below is our response to the concern raised:

**Concern#1**   With reference to the borrowers' (Patrick L. Amoriello and Paula S. Amoriello) loan, you provided us with a Notice of Error and requested to answer the queries outlined in your previous correspondence dated 05/01/2017.

**Response**   We strive to provide each of our customers with the utmost customer care and professionalism and are disappointed to hear that you feel this standard was not met. We regret any inconvenience that you may have experienced.

We have updated our records to reflect Gaita & Liszt P.L. as an Authorized Third Party (ATP). As an ATP, you can receive and discuss information regarding the loan.

To discuss account information, the authorized third party must provide the information below:

1. Mortgage account number
2. Account holder's name
3. Last four digits of the account holder's Social Security Number
4. Property address
5. Password (if any)

We have also updated our records to cease all written and verbal communication with the borrowers and direct it to your office at the below address and phone number:

NMLS # 1852

RRCMAINLTRM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

Page 1 of 3



# Ocwen Loan Servicing, LLC
### www.ocwen.com
*Helping Homeowners Is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936



2701 Boca Raton Boulevard, Suite 107
Boca Raton, FL 33431
Phone: 1-561-869-3703

All correspondence, including account statements and other required Notices, will be mailed to the new mailing address until further notice.

Ocwen's records indicate the loan originated with Homeward Residential, Inc., A Delaware Corporation, on 02/10/2017. On 02/16/2017, the servicing rights of the loan were transferred to Ocwen with the loan due for 04/01/2017. As Ocwen was not involved in the origination of the loan, it would not be able to comment on concerns regarding the origination of the loan. Further, the information we provide in relation to your request is limited only to the servicing of your account.

We have submitted a request for the Payment Reconciliation History to be sent to your attention; the payment history reflects all credits and disbursements made to the loan and the resulting loan status. You will receive the payment history under a separate cover.

Ocwen is the servicer of the loan, and not necessarily the owner of the loan. Ocwen was servicing the loan for Federal National Mortgage Association (Fannie Mae) Attention: 3900 Wisconsin Ave, NW, Washington, DC, 20016-2892 and phone number: 1-800-732-6643. Although the ownership of the loan may change, the ownership has no bearing on the servicing of the loan. Ocwen is obligated to service the loan according to the terms and conditions of the loan documents executed by the borrowers.

If you have a specific concern related to the servicing of your loan, please provide us with additional information regarding the concern, in order for Ocwen to research the matter further.

For any further information, you may contact our Customer Care Center at 1-800-746-2936 (Monday through Friday 8:00 am to 9:00 pm ET, Saturday 8:00 am to 5:00 pm ET and Sunday 9:00 am to 9:00 pm ET).

We trust that the information provided has fully addressed your concern. Please note that you may request copies of collateral or certain loan documents that were relied upon in making this determination. You may receive these documents by sending in a written request to the Research Department at the address mentioned below. Please visit our website (www.ocwencustomers.com) which is available 24 hours a day, seven days a week, as many of the answers to your account specific questions may be found there. However, should you have any further questions in regards to this issue, please contact our Research Department at 800.241.9960. Research Department works from Monday through Friday 9 AM to 5 PM ET. After speaking with our Research Department, if you still have questions or concerns, please feel free to contact the OCWEN consumer advocate through OCWEN's website or by phone at 800.390.4656. OCWEN consumer advocate works from 9 AM through 6 PM ET, Monday through Friday. You may also send written correspondence to the following address:

Ocwen Loan Servicing, LLC
Attention: Research Department
P.O. Box 24736
West Palm Beach, FL 33416-4736
Fax Number: 407.737.6375

NMLS # 1852                                                                                                    RRCMAINLTRM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

2-814-AER88-0000103-001-01-000-000-000-000



GAITA & LISZT P.L.
2701 NW 2ND AVE STE 107
BOCA RATON FL 33431-6707

